Jason A. Neville, W.S.B. #6-3433
Erica R. Day, W.S.B. #7-5261
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Ste. 400
P. O. Box 10700
Casper, WY 82602
Phone: 307.265.0700
Facsimile: 307.266.2306
Email: jneville@wpdn.net

Billie L.M. Addleman, W.S.B. # 6-3690
HIRST APPLEGATE, LLP
1720 Carey Ave., Ste. 400
P.O. Box 1083
Cheyenne, WY 82003-1083
Phone: 307.632.0541
Fax: 307.632.4999
Email: baddleman@hirstapplegate.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 FEB 18 PM 4 15

STEPHAN HARRIS, CLERK
CHEYENNE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BLACK CARD, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. **15CV 27 -S** |
| | ) | |
| VISA U.S.A., INC., | ) | |
| JOHN DOE CORPORATIONS I-X, and | ) | |
| JOHN DOES I-X | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, Black Card, LLC (hereinafter "Black Card"), through counsel, and hereby states the following facts constituting its claims for relief against Defendant Visa U.S.A., Inc. (hereinafter "Visa"), and seeks compensatory damages in excess of $600,000,000.00, as follows:

## I.    PARTIES.

1.    Plaintiff Black Card is a limited liability company incorporated in Wyoming, with its principal place of business in Jackson, Wyoming.

2.    Black Card owns and operates "Visa Black Card," a high-end luxury credit card marketed as an elite card with exclusive benefits including a twenty four hour concierge, industry leading rewards program, VIP airport lounge visits, and luxury gift program.

3.    At all relevant times, it is believed that Visa was a Delaware corporation, with its principal place of business in Foster City, California.

4.    Visa owns and operates a payments technology company that facilitates credit and debit financial transactions between consumers and merchants across the United States and globally.

## II.    JURISDICTION AND VENUE.

5.    This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship of the parties, and by virtue of the fact that the amount in controversy exceeds the statutory requirement of $75,000.00 exclusive of interest and costs.

6.    Venue is proper under 28 U.S.C. § 1391(c)(2);Visa is subject to the United States District Court for the District of Wyoming's jurisdiction in respect to this civil action; Visa has significant contacts with the jurisdiction.

## III.    FACTS COMMON TO ALL CLAIMS FOR RELIEF.

7.    Black Card originally trademarked the term BLACKCARD for use with credit and debit card services, under United States Trademark Registration No. 3,613,898.

8.    As part of a litigation settlement with American Express Marketing & Development Corp and American Express Travel Related Services Company, Inc. (hereinafter "American Express"), Black Card's then pending and owned trademarks (Black Marks) were transferred to American Express.

9.    Currently, the term BLACKCARD and/or BLACK and its derivatives (Black Marks), when used in connection with credit cards, charge cards or other payment products, is a trademark of American Express.

10.    Black Card is the sole licensee authorized to utilize the Black Marks owned by American Express. In other words, Black Card is the only credit card company in the United States permitted to call its credit card, "Black Card."

11.    As part of the license, Black Card must include a payment network (i.e., Visa) on all advertising, including the credit card itself.

12.    Since 2008, Black Card has developed and marketed its brand of credit card as the "Visa Black Card," investing significant monies in the development and consumer adoption of its brand.

13.    The Visa Black Card was designed to be a high-end luxury credit card and is marketed as an elite card with exclusive benefits such as a twenty four hour concierge, an industry leading rewards program, VIP airport lounge visits, and luxury gift program.

14.    The Visa Black Card is also unique amongst its competitors because of its patented design which includes a black stainless steel front with a carbon back.

15.    Surveys demonstrate that the "Black Card" brand is one of the most coveted and recognizable amongst consumers.

16.     On November 20, 2008, Visa and Black Card entered into a contract titled "Visa

U.S.A. Inc. Black Card LLC Promotional Co-Branded Card Agreement," (Contract); a true and

accurate copy of which is attached hereto and incorporated herein as "**Exhibit 1.**"

17.     The Contract memorialized Visa and Black Card's agreement to "launch and

actively market a Visa-branded (for general purpose use) Black Card co-branded payment card

program."

18.     The Contract specifies that "Visa and Black Card shall grant the rights and

perform the obligations, subject to the terms and conditions, as specified in Exhibits A, B and C

hereto."

19.     Exhibit C to the Contract provides the applicable "branding requirements," as set

forth below:

Black Card agrees to perform as follows:

> **A.     PROGRAM.**  Black Card agrees to enter into an agreement (the
> "Program Agreement") with a Barclays Bank Delaware ("Issuer") to
> launch and actively market a Visa-branded (for general purpose use) Black
> Card co-branded payment credit card  program (the "Program") for the
> duration of the Term.  During the Term, Black Card agrees that: (i) the
> Visa brand will be the only general-purpose payment card brand contained
> on any co-branded payment card issued as result of the Program; (ii) all
> Cards issued as a result of the Program will remain Visa-branded
> throughout the Term; and (iii) the Visa brand will be the only payment
> card brand associated on any payment card program that bears the Black
> Card mark during the Term (the preceding (i) through (iii) shall
> collectively be referred to as the "Branding Requirements").  If, for any
> reason, the Program Agreement is terminated prior to the natural
> expiration of the Term and a new program agreement is not entered into at
> least ninety days thereafter, Black Card acknowledges Visa may
> immediately terminate this Agreement for cause upon written notice to
> Black Card.

20.    Per the requirements of the Contract, Black Card entered into an agreement with

Barclays Bank Delaware (hereinafter "Barclays Bank") to serve as the issuer of the Visa Black

Card credit card.

21.    In recognition of the Parties' need to exchange confidential information with

economic value, the Contract contains the following provisions on confidentiality:

> **3.    CONFIDENTIALITY AND NON-DISCLOSURE**.    Visa and
> Black Card intend to disclose information to each other, which may
> include Confidential Information.
>
> (a) Confidentiality.  The Party receiving Confidential Information
> ("Recipient") disclosed by the other Party ("Disclosing Party")
> acknowledges the economic value of the Disclosing Party's
> Confidential Information.  The Recipient shall:
>
>> i.      use the Confidential Information only for the
>> purpose(s) set forth in this Agreement;
>>
>> ii.     restrict disclosure of the Confidential Information to
>> (i) consultants under an agreement for the
>> protection of confidentiality, (ii) employees, (iii)
>> attorneys for the Recipient and its Affiliates all of
>> the foregoing only to the extent each has a "need to
>> know" (collectively, "Permitted Parties") and not
>> disclose it to any other person or entity without the
>> prior written consent of the Disclosing Party;
>>
>> iii.    advise those Permitted Parties who access the
>> Confidential Information of their obligations with
>> respect thereto; and
>>
>> iv.     copy the Confidential Information only as necessary
>> for those Permitted Parties who are entitled to
>> receive it, and ensure that all confidentiality notices
>> are reproduced in full on such copies;
>
> A "need to know" means that the Permitted Party requires
> the Confidential Information to perform his or her
> responsibilities in connection with this Agreement.

22.    The Contract defines "Confidential Information" as follows:

"Confidential Information" means the terms of this Agreement as well as any information or date disclosed by a Party to the other Party under or in contemplation of this Agreement which (a) if in tangible form, is marked as proprietary or confidential, or (b) if oral, is identified as proprietary, confidential, or private on disclosure and is summarized in a writing so marked and delivered within 10 days following such disclosure.

23.    The Contract also regulates the Parties' use of each other's intellectual property,

as follows:

**5.    USE OF INTELLECTUAL PROPERTY.**    Except    as expressly set forth herein, this Agreement does not grant either party a license or right to use the trademarks, service marks, trade dress, corporate name, logos, brands, copyrights or other intellectual property of the other party. Any such use will require the prior written consent of the party that owns such intellectual property. Immediately upon execution of this Agreement, Black Card shall disclaim the use of the word "Black" in each of its two current trademark applications and will provide both Visa and Issuer with electronic verification upon USPTO confirmation of such disclaimer. Visa will not object to, interfere with, or take any legal action against Black Card, LLC's use, registration and license to third parties of the mark BLACKCARD or BLACK CARD for the services identified in U.S. Application Serial No. 77/291,240 (hereinafter, the "Black Card Services").

24.    The Contract further provides marketing materials using a party's name or

trademark must be approved in writing.

**11.    REVIEW.**    All written and broadcast materials created by or for a party including, without limitation, advertisements, marketing materials, press releases, point of purchase signage, mailings and any other signage which relate to the other party or any materials that contain the name or trademark of the other party will be subject to the other party's prior written approval which will not be unreasonably withheld. Each party will allow the other party at least ten (10) business days from receipt to review such materials. If for any reason the reviewing party does not respond within ten (10) business days, such materials will be deemed approved.

25.    From the period of 2008 through October of 2014, Black Card invested hundreds

of millions of dollars in establishing and marketing the Visa Black Card brand.

26.     From the inception of the Contract to December 17, 2013, a significant number of Visa Black Card credit cards were issued to consumers in the United States.

27.     Direct mail is Black Card's primary method of acquiring new clients, and therefore its primary source of revenue. Black Card estimates that 70 percent of its customer base is the result of direct mailings.

28.     Based on historical data, Black Card estimates that a significant number of consumers would have applied for the Visa Black Card in 2014, with a large number of new consumer accounts having been opened.

29.     Per the terms of the contract, approval from Visa was required for each marketing campaign. All marketing materials bore the name "Visa Black Card," requiring Visa's approval of every item of marketing material.

30.     The Contract provided that Black Card was responsible for marketing the Visa Black Card and using funding received from Visa exclusively for the growth of the co-branding card program, as agreed by the parties in their annual Marketing Initiatives.

31.     Visa routinely approved Black Card's print and television marketing campaigns from the start of the Contract through October 2013

32.     The Contract term expired in November 2013 but the Parties continued to operate under the terms and requirements set forth therein.

33.     As of December 2, 2013, Visa executives were preparing a proposal to extend the parties' contractual agreement and discussing a new contract so that payments from Visa to Black Card would not be interrupted. Nonetheless, the parties continued to operate under the terms of the 2008 Contract.

34.     In light of Black Card's marketing success with direct mailings, and in reliance upon Visa's continued approval of its marketing, Black Card made significant additional investment in its marketing and pre-paid for the printing of all of its direct mailings for 2014.

35.     In mid-December 2013, Visa informed Black Card that it had concerns regarding the naming protocol. In other words, after five years of uninterrupted successful marketing, Visa expressed concerns for the first time regarding the naming of the Visa Black Card. Without any basis, Visa stated that it was reevaluating the use of the name "Visa Black Card" because it believed the name created confusion amongst consumers about which party was offering the card. No such concerns had ever been articulated throughout the relationship.

36.     Visa arbitrarily and capriciously declined to give its approval of the January 2014 direct mailing materials. No supported basis for the denial was provided in response to Black Card's inquiries.

37.     Ultimately, Visa approved belatedly the January mailing campaign on a "one-time basis," but stated that its senior management would be re-evaluating the use of the name with the understanding that any direct mailing after January which included the name "Visa Black Card" would not be released without Visa's direct approval.   After five years of successful uninterrupted marketing efforts by Black Card, Visa expressed new concerns for the first time with the name of the credit card.

38.     Due to Visa's untimely "one-time" approval of the January marketing materials, Black Card was prevented from sending out its direct mailings in January.

39.     As a result of Visa's delay tactics, Black Card was prevented from capitalizing on its marketing momentum.

40.     Near the end of January, Black Card was again forced to cancel its February direct mailing campaign due to Visa's refusal to approve its marketing materials. To date, Visa has not provided any support for its concerns of name recognition.

41.     Again, due to Visa's delay tactics, Black Card was prevented from capitalizing on its marketing momentum.

42.     Black Card immediately informed Visa of the harm to the Black Card brand and ability to attract consumers caused by Visa's actions unreasonably delaying and canceling the direct mailing materials.

43.     In response, Visa informed Black Card on February 10, 2014, to proceed with "business as usual" in marketing the Visa Black Card. Black Card relied upon this promise and proceeded, as usual by investing significant monies to market and grow the Visa Black Card brand.

44.     Visa then informed Black Card it had revised their internal Visa Product Brand Standards with regard to co-branded card programs, and would expect Black Card to comply with the new standards in the future.

45.     The Visa Product Brand Standards had never been produced to Black Card, is not mentioned in the Contract, nor is it listed in the defined "Rules" of the Contract.

46.     Visa sought to impose arbitrary and capricious advertising restrictions on Black Card, such as requiring Black Card to display the front and back of the Visa Black Card on all advertising; and requiring the Barclays logo to appear prominently. Such restrictions were unique to Black Card, not imposed on other co-branding partners and certainly not, as promised by Visa, "business as usual."

47.     Visa demanded Black Card comply with the new Product Brand Standards while also continuing to emphasize that it intended for the co-branding agreement with Black Card to "continue to build on its current success."

48.     These arbitrary and capricious restrictions prevented Black Card from performing under the Contract and realizing the benefit of its investment.

49.     To alleviate the effects of the new restrictions and in an effort to relieve Visa's never before articulated concerns regarding naming, Black Card proposed several naming solutions that were intended to relieve Visa's alleged concern regarding consumer confusion. Visa rejected these proposals.

50.     Visa executives informed Black Card that going forward all marketing should refrain from using the name "Visa Black Card." Visa provided no rational basis for this significant change in the Black Card name brand.

51.     In May 2014, Visa refused to approve marketing materials which contained the words "Visa Black Card."

52.     Yet in June of 2014, Visa approved direct mailing materials with the wording "Visa Black Card."

53.     Again, in July of 2014 Visa refused to approve marketing materials with the wording "Visa Black Card," even though it was identical to the direct mailing materials approved by Visa in June.

54.     Visa later approved the July marketing materials after discussion with both Black Card and Barclays Bank.

55.     Black Card relied upon the promises and actions of Visa of "business as usual" to make significant investment in its brand and company.

56.     At the end of July, Visa provided Black Card with its recommendations for naming Black Card products in the future and a new financial incentive offer. Visa stated it was anxious to move forward in growing the co-branding program.

57.     Visa's proposed naming conventions would have removed the name "Visa Black Card" from the card. The words "black" and "card" were no longer allowed to be used together; thereby negating six years of brand development and the benefit of Black Card's investment.

58.     Further, Visa arbitrarily required Black Card to publish images of the reverse of its card in all marketing materials; no other co-brand partner is required to so by Visa.

59.     Black Card's brand, developed from its license from American Express, is "Black Card." Any deviation from "Black Card" negates the brand that has been built over the past six years.

60.     Visa's arbitrary and capricious requirements would effectively eliminate any naming convention that could be associated with "Black Card," effectively negating the brand.

61.     Forbidding "black" and "card" from being used together in advertisements vitiates the ability of Black Card to perform under the Contract and vitiates the brand established over the last six years, including hundreds of millions of dollars in investment. Such changes create consumer confusion, damage to the brand and overall impedes further growth.

62.     In January 2014, Black Card informed Visa of the launch of two new partner card lines, Titanium Card and Gold Card.

63.     In March 2014, Visa responded to Black Card with proposed marketing for its partner cards Titanium Card and Gold Card.

64.     Further discussions were held with Visa regarding Titanium Card and Gold Card. In reliance upon these discussions, significant monies were expended to market and manufacturer Titanium Card and Gold Card.

65.     The newly created arbitrary and capricious rules applied to the "Visa Black Card," and subsequently to Titanium Card and Gold Card, prohibited the launch of two new product lines at significant expense and potential market share.

66.     Throughout the relationship, Black Card provided Visa with its trade secrets, including its marketing studies, marketing plans, trademarked information and patented credit card designs and prototype.

67.     Visa had a contractual and common-law obligation to protect the trade secrets of Black Card.

68.     In March 2014, Black Card representatives met with representatives ofa separate corporate entity of Visa in China regarding Black Card's international market.

69.     At those meetings, anexecutive of a Visa subsidiary company disclosed that Visa would be openly and directly competing with Black Card both in the international and domestic markets.

70.     Upon information and belief, Visa shared confidential information with economic value to other Visa corporate subsidiaries such as the Black Card prototype, contrary to the purposes of the Contract.

71.     As a result of Visa's actions, Black Card has been unable to market and grow its brand.

72.     As a result, the partner cards Titanium Card and Gold Card have not been launched, despite significant monies expended for their development and manufacture.

73.     Further, Visa has utilized Black Card's confidential information in an effort to openly compete with the "Visa Black Card" domestically and internationally.

74.     If followed, Visa's requirements would prohibit Black Card from marketing in maintaining its brand, "Visa Black Card," enabling Visa to effectively eliminate a competitor and gain an increased market share when it launches its competing, high-end credit cards in both the United States and internationally.

### IV.     FIRST CLAIM FOR RELIEF:
### BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

75.     Black Card repeats and re-alleges the allegations of paragraphs 1 through 75 of the Complaint, as though specifically set forth herein.

76.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

77.     The implied covenant of good faith and fair dealing requires that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement.  It requires the parties to act in accordance with their agreed common purpose and each other's justified expectations.

78.     Visa had an implied duty of good faith and fair dealing in its contractual relationship with Black Card.

79.     Visa had an implied duty of good faith and fair dealing in its implied-in-fact contractual relationship with Black Card.

80.     Visa breached its implied duty of good faith and fair dealing in, but not necessarily limited to, the following manner:

      a.  Failing to approve Black Card's marketing efforts in a timely manner;

    b.  Failing to accurately disclose the reasons for refusing to approve Black Card's marketing efforts;

    c.  Arbitrarily impeding direct mail marketing;

    d.  Attempting to dilute the brand's value with arbitrary and capricious requirements to show the back of the card on all advertisements; and later forbidding the words "black" and "card" from being used together.

    e.  Retroactively requiring Black Card to comply with branding requirements that were not a part of the original Contract;

    f.  Failing to disclose Visa was knowingly and deceptively developing a competing product modeled after the Visa Black Card;

    g.  Disclosing confidential information with economic value to other Visa subsidiaries, including, but not limited to, the Black Card prototype, contrary to the purposes of the Contract;

    h.  Failing to act in accordance with Visa and Black Card's common purpose and Black Card's justified expectations;

    i.  Delaying the renewal of the parties' contractual agreements in bad faith;

81.    As a direct and proximate consequence of Visa's breach of the implied duty of good faith and fair dealing, Black Card has incurred compensable damages.

### V.   SECOND CLAIM FOR RELIEF: BREACH OF CONTRACT.

82.    Black Card repeats and re-alleges the allegations of paragraphs 1 through 82 of the Complaint, as though specifically set forth herein.

83.    A valid enforceable contract existed between Visa and Black Card for the co-branding of the Visa Black Card credit card.

84.     Black Card fully and completely performed its duties under the terms of the contract.

85.     During the contractual term, Visa breached the contract in, but not limited to, the following manner:

> a.  Actively working to develop a product to directly compete with the Visa Black Card;
>
> b.  Disclosing confidential information with economic value to other Visa corporate subsidiaries, such as the Black Card prototype, contrary to the purposes of the Contract;
>
> c.  Failing to approve Black Card's marketing efforts within a reasonable time; and,
>
> d.  Attempting to unilaterally modify the contract by introducing new marketing requirements;

86.     As a direct and proximate result of Visa's breach of the co-branding contract, Black Card suffered compensable damages in an amount to be proven at trial, plus pre-judgment interest, attorney's fees, and costs.

### VI.     THIRD CLAIM FOR RELIEF: BREACH OF IMPLIED-IN-FACT CONTRACT.

87.     Black Card repeats and re-alleges the allegations of paragraphs 1 through 87 of the Complaint, as though specifically set forth herein.

88.     Visa and Black Card intended to renew the co-branding contract and continue their contractual dealings in regard to the Visa Black Card.

89.     Visa manifested its assent to the implied-in-fact contract by continuing to approve Black Card's marketing efforts for the Visa Black Card after the end of the prior contractual

term, and by instructing Black Card to continue with "business as usual" while the contract renewal was finalized.

90.     Further, Visa stated it was scheduling the contract negotiations and target renewal so that there would be no interruption of the payments from Visa to Black Card in the future.

91.     Visa continued to refer to Black Card as a partner, and express its desire to continue growing the co-branded program with Black Card.

92.     Visa intentionally misled Black Card into believing there was an ongoing contractual relationship between the parties when it continued to approve Black Card's marketing efforts and instructed Black Card to continue with "business as usual".

93.     Visa knew Black Card would believe a contract had been formed between the parties based on Visa's conduct outlined above, and that Black Card would accordingly perform its contractual duties and would continue performing those duties in the future based on Black Card's belief the parties had both agreed to continue their contractual agreements.

94.     Black Card reasonably relied on Visa's manifestation of assent to the implied-in-fact contract and continued to act as though a contract existed between the parties.  Black Card continued to market the Visa Black Card at a significantly increased cost.

95.     An implied-in-fact contract existed between Visa and Black Card, and Visa breached the implied-in-fact contract in, but not limited to, the following manner:

            a.  Actively working to develop a product to directly compete with the Visa Black Card;

            b.  Disclosing confidential information with economic value to other Visa corporate subsidiaries, such as the Black Card prototype, contrary to the purposes of the Contract;

    c.  Failing to approve Black Card's marketing efforts within a reasonable time;

    d.  Attempting to unilaterally modify the contract by introducing new marketing requirements; and,

    e.  Failing to negotiate in good faith.

96.    As a direct and proximate result of Visa's actions described above, Black Card suffered compensable damages in an amount to be proven at trial.

## VII.  FOURTH CLAIM FOR RELIEF: EQUITABLE ESTOPPEL.

97.    Black Card repeats and re-alleges the allegations of paragraphs 1 through 97 of the Complaint, as though specifically set forth herein.

98.    Visa acted in a manner meant to mislead Black Card into believing a contract existed between the parties, or would imminently, by continuing to approve Black Card's marketing efforts and referring to Black Card as a partner.

99.    Further, Visa instructed Black Card to continue operating as "business as usual," leading Black Card to continue expending resources on the marketing of the Visa Black Card in an effort to continue expanding its consumer base.

100.    These actions by Visa caused Black Card to reasonably believe that a contract existed between the parties, or would imminently.  Black Card relied upon these reassurances when it continued expending resources to market the Visa Black Card.

101.    Black Card was not aware that Visa did not intend to renew the co-branding agreement or that Visa was developing a similar competing product at the same time.

102.    As a direct and proximate result of Visa's actions, Black Card suffered compensable damages in an amount to be proven at trial.

103.     Based on its actions, Visa is equitably estopped from asserting that it is not contractually bound by the co-branding agreement.

## VIII.   FIFTH CLAIM FOR RELIEF: PROMISSORY ESTOPPEL.

104.     Black Card repeats and re-alleges the allegations of paragraphs 1 through 104 of the Complaint, as though specifically set forth herein.

105.     Visa made a clear and definite promise to Black Card that the co-branding contract would continue.

106.     Visa should have known that its promise to renew the co-branding contract would induce Black Card to take action in reliance on its promise.

107.     In reliance on Visa's promise regarding the co-branding agreement, Black Card continued to engage in expensive marketing efforts to support its product in the marketplace.

108.     Visa was aware of Black Card's continued marketing efforts, and encouraged Black Card to continue "business as usual" when Black Card requested explicit assurance.

109.     As a result of Visa's promise to renew the co-branding agreement, and Black Card's continued marketing efforts, Black Card has suffered compensable damages in an amount to be listed at trial.

110.     Black Card is entitled to be compensated for its damages, as its actions were reasonably induced by Visa's promise to renew the co-branding contract and instruction to carry on "business as usual."

111.     The only way to avoid an injustice is to enforce Visa's agreement to continue the co-branding agreement and compensate Black Card for the associated damages due to Visa's breach of the Contract.

112. Visa also intentionally misled Black Card into believing that its partner cards, Titanium Card and Gold Card, would be approved and imminently launched, based on its correspondence and expressed desire to increase its consumer base.

113. The launch of the Titanium and Gold cards have been permanently delayed because of Visa's actions in delaying the marketing of the Visa Black Card, and unreasonable naming protocols.

114. Significant resources were invested in preparing the launch of the Titanium and Gold partner cards, based on the expectation that a co-branding agreement with Visa would be forthcoming.

115. The only way to avoid injustice is to enforce Visa's promises to co-brand the Gold and Titanium partner cards, and provide compensation for the delay in launching the partner cards.

**IX. SIXTH CLAIM FOR RELIEF: INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP.**

116. Black Card repeats and re-alleges the allegations of paragraphs 1 through 116 of the Complaint, as though specifically set forth herein.

117. A valid contractual relationship exists between Black Card and the individuals with Visa Black Card credit cards, as evidenced by the card agreement forms.

118. Holders of the Visa Black Card choose the card because of its exclusive and elite status and recognition in the market.

119. Visa is aware of the contractual relationship that exists between Black Card and the holders of the Visa Black Card credit card, as Visa regularly monitors the number of Visa Black Card credit cards issued. Further, Visa, as a large credit card company, is aware of the nature of the relationship between holders of the Visa Black Card and Black Card.

120.   Visa intentionally and improperly interfered with the contractual relationship between the holders of Visa Black Card credit cards and Black Card by delaying the renewal of the co-branding agreement and developing a similar, competing product.

121.   Further, by attempting to force Black Card to change the name of all Visa Black Cards, the existing cards would have lost their elite status which is a significant attraction for the current holders of the card.

122.   As a result of Visa's actions, Black Card has suffered compensable damages in an amount to be proven at trial.

### X.    SEVENTH CLAIM FOR RELIEF:
#### INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE.

123.   Black Card repeats and re-alleges the allegations of paragraphs 1 through 123 of the Complaint, as though specifically set forth herein.

124.   Black Card continued to solicit business and market the Visa Black Card to potential card holders during its contract term with Visa and during the implied-in-fact contract.

125.   Visa knew that Black Card was continuing to market the Visa Black Card to potential card holders in an effort to establish business relationships and continue building the brand.

126.   Visa purposefully attempted to prevent Black Card and potential Visa Black Card holders from entering into contracts by deliberately delaying its approval of Black Card's marketing efforts.

127.   In some instances, Visa denied marketing materials which were identical to those approved by Visa in the prior month.

128.    Black Card informed Visa of the damaging effect that Visa's conduct had on Black Card's prospective relationship with potential Visa Black Card credit card holders, but Visa continued its inappropriate behavior.

129.    As a result of Visa's actions, Black Card's marketing efforts were delayed or canceled on three occasions.

130.    Due to Visa's actions, Black Card has suffered compensable damages in an amount to be proven at trial.

131.    As a result of Visa's actions in canceling or delaying marketing of the Visa Black Card, the launch of the Titanium and Gold partner cards have been permanently delayed.

132.    The delayed launch of the Titanium and Gold partner cards has prevented the formation of prospective relationships with potential Titanium and Gold card holders.  These delays have resulted in compensable damages in an amount to be proven at trial.

**WHEREFORE,** Black Card respectfully prays that the Court enter judgment in favor of the Plaintiff, award Plaintiff its actual damages, reasonable and necessary attorneys' fees, prejudgment and post-judgment interest as allowed by law, costs of suit, and such other and further relief as the Court deems just and proper.

DATED this ___ day of February 2015.

                                      **PLAINTIFF BLACK CARD, LLC**

                                      Billie L.M. Addleman, W.S.B. #6-3690
HIRST APPLEGATE, LLP
1720 Carey Ave., Ste. 400
P.O. Box 1083
Cheyenne, WY 82003-1083
Phone: 307.632.0541
Fax: 307.632.4999
Email: baddleman@hirstapplegate.com

Jason A. Neville, W.S.B # 6-3433
Erica R. Day, W.S.B. #7-5261
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Ste. 400 (82601)
P.O. Box 10700
Casper, WY 82602
Phone: 307.265.0700
Fax: 307.266.2306
Email: jneville@wpdn.net